BARRETT CO. et al. v. EWING.

(Circuit Court of Appeals, Second Circuit. April 10, 1917.)

No. 106.

1. COURTS ⬥270—FEDERAL COURTS—DISTRICT IN WHICH SUIT SHOULD BE BROUGHT.
    As the official residence of the Commissioner of Patents is in the District of Columbia, suits against him in his official capacity should be commenced in that District.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. § 810.]

2. COURTS ⬥276—FEDERAL COURTS—DISTRICT IN WHICH SUIT MAY BE BROUGHT—CONSENT.
    Rev. St. § 4915 (Comp. St. 1916, § 9460), provides that, when a patent is refused, the applicant may have remedy by bill in equity, that the court having cognizance thereof many adjudge that such applicant is entitled to a patent, that any such adjudication, if in favor of the applicant, shall authorize the Commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and that, where there is no opposing party, a copy of the bill shall be served on the commissioner. *Held* that, where there is no opposing party, the Commissioner may with his consent be sued outside the District of Columbia.
    [Ed. Note.—For other cases, see Courts, Cent. Dig. § 815.]

3. PATENTS ⬥328—ANTICIPATION—IMPROVEMENT IN STREET PAVEMENTS.
    An alleged invention of an improvement in street pavements, consisting of the application to the surface of a concrete pavement of a thin layer of bituminous compound, and the sprinkling or spreading and embedding of sand or small stone fragments into this compound, was anticipated by the Hubbell patent, No. 158,415, covering a process consisting in saturating the concrete forming the wearing surface of a pavement with a thin body or solution of hot pitch or bitumen, though Portland cement, used in the art to which the alleged invention relates, was not used in commercial pavements until after the date of the Hubbell patent.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by the Barrett Company and another against Thomas Ewing, as Commissioner of Patents. From a decree dismissing the bill, complainants appeal. Affirmed.

The plaintiff is a corporation organized and existing under the laws of the state of West Virginia and having its principal place of business in the borough of Manhattan, in the city of New York.

August E. Schutte is a citizen of the United States and a resident of the city of Boston in the state of Massachusetts.

Thomas Ewing is United States Commissioner of Patents, having his official residence in the city of Washington, D. C.

---

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On January 26, 1907, an application for letters patent serial No. 354,318 was filed in the United States Patent Office by Schutte, and during the pendency of the application the entire right, title, and interest in the application aforesaid and in the alleged invention therein claimed was by mesne assignments in writing sold, assigned, and transferred to the said Barrett Manufacturing Company, which assignments were recorded in the United States Patent Office.

The application for letters patent was rejected by the primary examiner and then by the board of examiners in chief, and finally by the Commissioner of Patents. An appeal was then taken to the Court of Appeals of the District of Columbia, and that court affirmed the decision of the Commissioner.

Notwithstanding the aforesaid adverse decisions, the Barrett Company, as assignee of the alleged inventor, still claims to be entitled to receive a patent for the invention set forth in the application, and this suit was commenced in the District Court for the Southern District of New York, praying that the court adjudge and decree that the aforesaid Schutte is the original inventor of the improvements set forth in the application, and that the Barrett Company is entitled to receive a patent for the invention as specified in the claims and as assignee of Schutte. It also prays that the Commissioner of Patents be authorized and directed to issue letters patent to the Barrett Company, assignee of Schutte.

The Commissioner accepted service and consented expressly to the jurisdiction of the District Court for the Southern District of New York.

Merwin & Swenarton, of New York City (T. D. Merwin and W. H. Swenarton, both of New York City, of counsel), for appellants.

William R. Ballard, of Washington, D. C., for appellee.

Wm. A. Redding, Arthur C. Fraser, and Henry M. Turk, all of New York City, amici curiæ.

Before COXE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is a suit in equity brought under the provisions of section 4915 of the Revised Statutes, being section 9460 of 8 U. S. Compiled Statutes 1916 Annotated, which reads as follows:

"Whenever a patent on application is refused, either by the Commissioner of Patents or by the Supreme Court of the District of Columbia upon appeal from the Commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the Commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and otherwise complying with the requirements of law. In all cases, where there is no opposing party, a copy of the bill shall be served on the Commissioner; and all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not."

But before we consider whether the plaintiffs are entitled under the above provision to have a decree from this court establishing their right to receive a patent for the invention as specified in the claims herein involved, it will be necessary to determine a preliminary question.

As the suit against the Commissioner was commenced in the Southern District and not in the district in which the Commissioner officially resides, counsel for the Commissioner in his argument in this court suggested that there may be a question as to the power of the Com-

missioner to consent to be sued in the Southern District of New York, and he has called to our attention three possible grounds of objection. This he has done without stating any opinion which he may entertain as to their merits. These objections are as follows:

(1) That the Supreme Court of the United States declared in Butterworth v. Hill, 114 U. S. 128, 5 Sup. Ct. 796, 29 L. Ed. 119, that the Commissioner of Patents is by law located in the Patent Office and has his official residence at Washington, in the District of Columbia.

(2) That the writ of mandamus to the Commissioner of Patents may only issue from the Supreme Court of the District of Columbia.

(3) That the Department of Justice is given certain powers in regard to suits in which the United States or any officer thereof as such officer is a party or may be interested. See Revised Statutes, §§ 346, 359, 361, 365, 366, 367 (Comp. St. 1916, §§ 515, 533, 536, 540–542).

[1] It may be said of the first suggestion that, inasmuch as the Commissioner's official residence is in the District of Columbia, suits which are brought against him in his official capacity should be commenced in that district by virtue of the provision which requires suits to be brought in the district of which the defendant is an inhabitant. This, however, affords no light on the question whether he has the right, which other defendants are conceded to possess, to waive service in the district of his legal residence and to consent to be sued elsewhere.

It may be said of the second suggestion that it has no bearing on the question under consideration. The statute under which this suit is brought does not contemplate the issuance of a mandamus. Mandamus is a law remedy, and is not sought in this proceeding. It is a suit in equity and not an action at law which section 4915 of the Revised Statutes authorizes.

It may be said of the third suggestion that it is quite inconclusive, inasmuch as the supervisory power of the Department of Justice is coextensive with the territory of the United States and is the same in all the districts.

Is it contrary to public policy that the Commissioner should consent to be sued in a district other than that of his official residence?

[2] The general rule is that a person may waive any right to which he is entitled. But the right to do so is subject to the qualification that no waiver can be upheld which is contrary to public policy. It is for this reason that courts have held that all agreements which seek for example to waive the defense of usury, and agreements to waive objection to acts done or contracts entered into in violation of Sunday laws, are void. But that which Congress has by law permitted cannot be regarded by the courts as contrary to public policy. And Congress, in one instance at least, has authorized suits to be brought outside the District of Columbia, against the head of a department whose official residence is in Washington. Thus Congress provided in section 736 of the Revised Statutes (Comp. St. 1916, § 1031) that proceedings may be instituted against the Comptroller of the Currency in other districts than that of which he is an inhabitant. That section expressly declares that all proceedings by any national banking

association to enjoin the Comptroller under the provisions of any law relating to national banking associations shall be had in the district where such association is located.

It seems unreasonable to suppose that Congress intended by the statute that suits should be brought in the same court which had already passed upon the questions involved, and without regard to the residence of the parties. The act says that after the Commissioner of Patents has refused an application for a patent, or after it has been refused by the Supreme Court of the District of Columbia upon appeal from the Commissioner, "the applicant may have remedy by bill in equity." It does not say that the bill must be filed in the District of Columbia. And after providing that the defeated applicant may have remedy by bill in equity it declares, not that the Supreme Court of the District of Columbia may adjudge, and so forth, but that "the court having cognizance thereof" after notice and other due proceedings may adjudge that the applicant is entitled to receive a patent.

Under the statute, the Commissioner of Patents is not a necessary party to the proceedings. It provides that the parties adversely interested in the application and who are opposing allowance of the patent (as parties to an interference proceeding) may be made parties defendant. And it requires that, "in all cases, where there is no opposing party a copy of the bill shall be served on the Commissioner." This implies that he need not be served if there be opposing parties who have been made defendants. In this case, no opposing parties have been made defendants, and the Commissioner himself is made defendant and had to be served. If the Commissioner had not been made a defendant and opposing parties had been named as defendants, the case might have been brought in any district of which the defendants were inhabitants and the Commissioner would have been concluded by the decree. For the statute provides that, if in such a suit the adjudication is in favor of the applicant, a copy of the adjudication may be filed in the Patent Office, and such adjudication "shall authorize the Commissioner to issue such patent." As the Commissioner may be bound therefore by an adjudication in a suit in another district and to which he is not a party, we can see no reason of public policy which requires this court to say that in a suit under this provision of the statute, in which suit he is a party, the law will not permit him to consent to be sued outside the district in which he has his official residence. The rights of the United States are not prejudiced by such a waiver.

[3] This brings us to a consideration of the case upon the merits. The question is whether the Commissioner of Patents should be directed to issue letters patent to the Barrett Manufacturing Company as assignee of August E. Schutte, claiming to be the inventor of certain improvements in street pavements.

An application for a patent was filed by Schutte on January 26, 1907. The application was duly considered by an examiner in chief in the Patent Office and denied. It was then passed on by the Commissioner of Patents and again denied. An appeal from the Commissioner was then taken to the Supreme Court of the District of Columbia (now Court of Appeals), and the application was again denied. Then

this suit was commenced in the District Court of the United States for the Southern District of New York asking that the court direct the Commissioner to grant the patent, and that application has been denied. The opinion of the District Judge was that the previous decisions were "very obviously right." It was his opinion that:

"Certainly no evidence has been presented to overcome the extremely strong presumptions raised by the formal and unanimous action of so many competent tribunals."

The Commissioner of Patents rested his adverse decision upon the decision in Re Groves, 200 O. G. 856, saying that the art cited being so old the difference of one year in the filing dates of the Schutte and Groves applications was inconsequential. The decision of the Court of Appeals of the District of Columbia was based on the same reasoning. The court said:

"This alleged invention, expressed in substantially the same claims, was before us on the appeal of Groves (In re Groves, 41 App. D. C. 316), and we then affirmed the decision of the Patent Office that nothing patentably novel was shown. The application in the present case was filed about a year prior to that in the Groves Case, but this fact in no way affects the situation. We agree with the Patent Office that no reason has been shown why the same conclusion should not be. reached in this case as in that of Groves. We therefore affirm the decision."

It seems that Groves was a highway engineer of Ann Arbor, Mich., and in 1909 he laid in Ann Arbor a pavement of the exact character described in the Schutte application. Groves had no knowledge of Schutte or of his invention at the time this pavement was laid, or at the time his application was filed, about a year and a half later. Groves was not himself familiar with the highly technical subject-matter of patentable inventions, and like a great majority of inexperienced applicants, he believed his invention to be a great deal broader than it was, and his original specification did not cast much light on the invention.

The inventions of Schutte and Groves are identical, in that the pavements actually constructed by them are the same, but the disclosures of their respective applications are not identical.

Schutte is also a highway engineer and a man of long experience with patents. Further, he is connected with a manufacturing firm who make a specialty of highway construction materials, and have for many years devoted their resources to the development of pavements and highways. With these advantages, Schutte in his specification better defined the alleged improvement of his invention.

The pavement built by Groves preceded in point of time construction on a large scale by Schutte, and consequently the pavement which has attracted the attention of the highway engineers of the country is the Groves pavement, a sample of which is in evidence.

Groves' description of his invention showed no patentable difference from the prior art. There was no description of the nature of the concrete. He used the term as an alternative for macadam and thereby not only did not disclose a specific concrete foundation, but treated macadam as the equivalent of concrete. Furthermore, there is no description of the coating as a distinct surface layer, such as is dis-

closed by Schutte, except the functional statement that the surfacing coat will not flake off from the base; and there is no statement that the concrete must have a "clean stone surface." In fact, it is obvious that no such surface was regarded as essential, for it would be quite impossible to give a macadam road, composed as it is of unbound particles, a surface corresponding even remotely to a stone surface.

His description of the method of shaping the surface of the roadbed is applicable to concrete construction, but he states it as the method of surfacing macadam as well, while his description of the application of tar must be understood to mean that only so much of it is allowed to remain on the surface as is absorbed; the surplus being swept off to the gutters instead of remaining as an adhering layer, of measurable thickness or depth.

Schutte's alleged invention relates to the art of constructing pavements from Portland cement, stone, and sand, commonly known as concrete. It consists in the application to the surface of such a pavement of a thin layer of bituminous compound and the sprinkling or spreading and embedding of 'sand or small stone fragments into this thin layer of bituminous compound.

The ordinary granolithic pavements made by mixing stone and sand with hydraulic or similar cement are said to produce roadways which are too hard for horses and too slippery in wet weather, causing horses to injure their feet and hoofs and causing them to fall, and automobiles to skid. And, where the upper layer is composed of ordinary concrete, the roadway is said to be not quite so slippery; but it wears out very rapidly.

Schutte proposed to remedy that condition. His idea is that if a concrete surface composed of any proportion of stone, sand, and Portland cement, after having set hard, is covered with a thin layer of, say, one-eighth to one-quarter of an inch of relatively pure bitumen or similar cement, and if then sand or small stone chips are thrown upon the surface there will be produced a very suitable and desirable wearing surface—a surface rough enough to prevent automobiles from skidding, elastic and resilient enough to give a good foothold to horses and soft enough to deaden the noise produced by traveling vehicles.

He admits in his specifications that he is aware of the fact that bituminous compounds have been used to fill the honey combed portions of bituminous pavements, and also that, in some cases in reservoir construction, a coating of bituminous compound has been used to make the structure water tight; but he is not aware of roadways constructed of hydraulic or similar concrete treated with a bituminous composition as above stated, in order to produce a nonslippery, elastic surface and to eliminate the wear of the concrete.

He states that:

"A roadway produced according to my invention above described will have the strength and rigidity of concrete (making it possible to lay it on the worst possible soil) and will have the good qualities of a good bituminous pavement without its slipperiness and great cost. It can readily be seen how the cost of such a pavement will be much smaller than the cost of any known bituminous pavement, as the amount of bitumen used is very small and no plant is required for the production of the surface mixture, and so forth.

"To practice my invention, I lay upon the subsoil four to six inches of con-

crete (and in some cases even less) produced in any suitable proportion. I spread over this concrete after the same has set hard (or at any time during the period of setting) a layer of one-quarter of an inch of suitable relatively pure bituminous compound or a mixture of this composition with an amount of fine sand or dust. This can be applied by any suitable means. After the application of the aforesaid bituminous coating, I spread over its surface stone chips cold or hot, or sand, and allow these chips to either be ground in by traffic or forced in by rollers, tamps, or any other suitable means. In this manner I produce a pavement according to my invention having the qualities above described."

In the argument in this court the plaintiffs relied upon claims 2 and 3, which read as follows:

"2. A pavement composed of a relatively thick layer of hydraulic concrete which forms the body of the pavement, said layer having applied directly to its upper surface a relatively thin adhesive cushioning and sealing layer of bituminous cement with mineral matter embedded therein.

"3. A road pavement, comprising a rigid concrete base having a clean stone surface and a distinct surface layer of substantially pure bitumen of approximately one-eighth to one-quarter of an inch in thickness firmly adhering to said clean stone surface, and sufficient inert granular material, to afford a foothold for horses, embedded in the exposed face of said surface layer."

The invention involved in this appeal is a pavement intended for vehicular traffic on city streets and main traveled roadways generally. The pavement consists essentially of two parts, viz. a base of concrete of such strength and rigidity as to be laid directly on the soil, and a surface layer of substantially pure bitumen of one-eighth to one-quarter of an inch in thickness, uniformly covering the surface of the concrete and firmly adhering to it throughout. To insure a perfect and uniform adhesion between the concrete and the surface layer, the upper face of the concrete must, in the language of the inventor who personally drafted the original specification, be "a clean stone surface."

The bitumen is applied hot in liquid form to the concrete, and, after it has been evenly spread over the surface, coarse sand or stone chips are rolled or otherwise forced into the bitumen while still soft enough for them to be firmly embedded in its upper surface; the purpose of their use being to afford a suitable foothold for horses and sufficient tractive grip for the wheels of motor vehicles.

In the argument in this court, stress was laid upon the fact that Schutte's alleged invention is a "combination," not merely because its various factors unite in the production of the unitary result of an improved pavement, but also because the specific characteristics of each of the elements of the combination directly affect, and contribute to the successful working of, the other elements of the combination.

And we are informed by counsel that prior to the invention of the applicant a rigid concrete had never been successfully used in pavement construction except as a foundation between the soil and the pavement proper of brick, asphalt, wood, or other structural material. They say in their brief that:

"Without Schutte's coating the concrete is short lived, and of little value as a roadway. With it, as shown by the evidence, it produces a pavement equal,

if not superior to, the expensive asphalt pavements, and for a fraction of their cost."

In the court below, the plaintiffs' application was denied because of the Hubbell patent, No. 158,415. The application for that patent was filed on December 19, 1874, and it was granted on January 5, 1875. In his specification he stated:

"My present invention is an improvement upon the street pavement for which letters patent No. 115,475, dated May 30, 1871, were granted to me, and the nature of this invention is a process which consists in saturating the concrete which forms the wearing surface of the pavement with a thin body or solution of hot pitch or bitumen, so as to more firmly unite the particles of the concrete and prevent more effectively the formation of dust from the concussion of horses' feet and action of the wheels of vehicles which tend to pulverize and wear it."

He also declared:

"The concrete is composed chiefly of Rosendale or hydraulic cement, and to harden it most effectively is saturated with a solution of lime, though the lime, which is of itself one kind of cement, may be omitted, but the hydraulic cement should in all cases be used to form the wearing surface. There are various brands of hydraulic cement, and I do not confine my invention to any one exclusively. The Rosendale or other suitable and economical cement should be used."

And his claim was stated as follows:

"The improved process of making the surface of my pavement, consisting of combining or slushing and saturating the concrete surface with hot bitumen or tar by absorption, after the hydraulic concrete is laid or set, substantially as described."

The Hubbell pavement substantially consists of broken stone laid upon gravel or earth for a foundation, and bound together by cement and coal ashes or sand between the interstices of the stone, binding them together and forming a wearing surface immediately above the surface of the broken stone.

In the Hubbell patent, we are told the cement used was Rosendale cement which in 1874 counsel say was the only cement obtainable in the United States for road making, and that that was an entirely different thing from Portland cement. The claims make no mention of Portland cement, although the specification declares that the invention relates to pavements constructed from Portland cement, stone, and sand. The plaintiff called as an expert a graduate from the School of Mines at Columbia University, who had had experience as a consulting engineer on cement and concrete work, and who for a number of years had been inspector of asphalt and cement work for the District of Columbia. He testified that the first commercial pavements of Portland cement were laid about 1906, and that the first Portland cement factory was built in this country at Copley, Pa., in 1875. He also pointed out the difference between Portland cement and Rosendale cement, declaring them to be totally different, although he admitted that both are hydraulic cements. He testified that:

"When Portland cement sets in water, it sets to a hard stonelike material, while the natural or Rosendale cement, such as was used in Hubbell's time,

242 F.—33

are set to chalklike material, and they harden very slowly. They could not have been used for paving surfaces, nor could a bituminous coating adhere to them on account of their chalkiness."

Portland cement was made 50 years before Hubbell, and, while it was expensive, it was not unknown in this country at the time Hubbell made his application.

And, while Hubbell refers to Rosendale cement, he did not confine himself to that, but declared:

"There are various brands of hydraulic cement, and I do not confine my invention to any one exclusively. The Rosendale or other suitable and economical cement should be used."

This certainly is broad enough to include Portland cement which is a hydraulic cement. They both operate in exactly the same way. It was well said by the District Judge that:

"If an earlier patent set forth as an ingredient in his patented compound sugar, and a later patentee suggested granulated sugar, for a similar compound designed for the same purpose, it would be impossible to discover invention in the light of the known art. I think the analogy applicable to this case."

When Hubbell's cement has "well set," he declares:

"I slush its surface with thin hot bitumen or pitch, and dust the surface of bitumen over with dry cement, and roll and sweep it on the surface to adhere to the bitumen, and thus more effectively hold the particles of cement together and prevent them as far as practicable from forming dust."

When Schutte's concrete has "set hard," he spreads upon it—

"a layer of one-quarter of an inch of suitable relatively pure bituminous composition, or a mixture of this composition with an amount of fine sand or dust. After the application of the aforesaid bituminous coating, I spread over its surface stone chips or sand and allow these chips to either be ground in by traffic or forced in by rollers, tamps, or any other suitable means. In this manner I produce a pavement according to my invention."

This court is of the opinion that Hubbell anticipated Schutte, and that the bill was properly dismissed.

Decree affirmed.